The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit, Oyez, Oyez, Oyez. All persons having a matter of form of business before the Honorable, the Judges of the United States Court of Appeals, are not to draw nods and give their attention to the court is now sitting. Thank you. Good morning and welcome to the 4th Circuit from a distance. On behalf of Judge Richardson and the entire 4th Circuit, we also want to extend our appreciation to Judge Bell for sitting on the panel with us today. Additionally, I know that since there is some schooling, a lot of them are listening to 4th Circuit arguments as part of their civic education, and we're honored to be a part of that. And in particular, I know that three students are listening, Henry, Charlie, and Ev Davis, and we want to welcome them. And with that, we'll get started with our first argument. Ms. Gross, United States v. Ms. Watkins. Thank you. Good morning, and may it please the court. My name is Beth Gross and I am here today to represent the appellate list nicely. This case has two parts. I will be handling the first part, which is the police-citizen encounter aspect, and Ms. Haney, who's there, will be handling the warrant issue. This is a case about an unlawful seizure of two men who were sitting in a parked truck in the parking lot of a hotel, which one of the men was a guest, when they were confronted by a police officer who effectively blocked their truck in their fully-marked SUV so he could conduct a drug investigation. So when is it that you attest that the seizure took place? Our position is that the seizure took place when the officer pulled his SUV into the parking lot of the Eurosuites Hotel. Okay, and in that regard, you said that he, quote, effectively blocked their way. I think you used the word effectively intentionally because he did not actually block their way. Could you explain your position on that? Sure. I used the words effectively blocked specifically because the district court found there was a possible way for Mr. Nicely to have gotten out. And was there some way he possibly could have gotten out? Sure, but that's not the issue. The issue is whether he felt free to leave. And effectively blocked, in those language, I mean he would have had a very difficult time getting out because there was a one-way entrance and a one-way exit. There's a, within our transcript. Counsel? Yes? In response, responding to Judge Thacker's question, can you talk a little bit about the standard we're applying here? I mean, you know, the district court judge here finds that there was ample space to back out and, you know, goes on to talk about, I know you want to characterize it differently, but that strikes me as sort of a classic fact-finding that he had ample space to back out, he was able to do so. It doesn't mean he, like, reasonably believed he could, but that he was capable of leaving is a classic fact-finding that we review extraordinarily deferentially. And you seem to be wanting to change those facts. Is that, do you have to do that in order to win? No, no Judge. I don't, I see the facts, our facts the way we see them are different obviously than the district court found, and I know that you see facts based on clearly erroneous. I don't want to change the facts necessarily, but we don't agree with them. And I don't need that to win. I believe that a reasonable person standard doesn't, I don't need that to win. A reasonable person still couldn't have found it reasonable to leave in that situation with all of the facts that we're looking at combined. So, no. But following up on Judge Richardson's question, didn't the district court actually find that there was a clear path to back out in a way? He, I, the district court said that he could have possibly gotten out, but just because he said, did the district court say possibly? I think he said there could have been room to leave. I think that was the quote. There could have been room to leave. So the quote is ample space for the defendants to back out and drive away. I mean that's, that's not like could have been, maybe, possible, right? Ample space to back out and drive away. I don't agree with that. Okay. I understand that. And that's what I'm trying to identify. Is, is that fact necessary for you to win? I understand you began your argument by saying, in essence, the district court got it wrong on the facts and they were effectively blocked in. But that's just not what the district court found. And so I'm just trying to identify, do you need that argument you're making that we ought to find the district court's findings clearly erroneous so that you can prevail? No, I don't believe I need that to prevail, Judge. Okay. But, but you are arguing that is one ground and then you have an alternative ground. Can you talk for a second about what the alternative is if, if I accept the district court's fact finding? Sure. If we accept that they could have gotten out, it's still not reasonable for a reasonable person to believe they could have, they should have gotten out, that they could have left because of the, the whole surrounding circumstances of the event. So we have to look at it as a, as a whole part, not just a piece of the pie. You know, whether they felt that they were effectively blocked, what a reasonable person would have believed is, is the issue. And I think that's the issue where the district court got it wrong. But, but on what basis would they have not felt they could leave? Looking at the video, it appears that the police car is three parking spaces away. Sure. You're looking at the video. Let me kind of go back a little bit. So the video, unfortunately, doesn't show the beginning of this encounter. So we don't know how, how the officer pulled up. We don't know how they approached the vehicle. We don't know how all that started because we don't have that evidence, unfortunately. But wait, you mentioned how they approached the vehicle. I thought that your argument was that the seizure occurred once they, once the officer pulled into the parking lot and effectively blocked the vehicle. Yes. So that's before the approach. That's correct. So we don't have any of that on, we don't have any, any tape of that. So there's, we don't know how that all went down. The, the basic facts that I would like to lay out to show that a reasonable person wouldn't have felt free to leave includes not only the way they parked the vehicle, a cabby-cornered way they parked, this officer parked his SUV, but also that it was at a hotel where these two men, one of these men was a guest at the hotel. It was 1.30 in the morning. This officer was in a fully marked SUV. He came from a tiny, tiny parking area at a bank across the way and pulled directly, directly behind Mr. Nicely's vehicle. There were other parking spots there. He could have parked in any parking spot to make it more casual, but he parked directly cabby-cornered, even though a few feet away from Mr. Nicely's vehicle in order to back, he still parked in a way that was aggressive instead of just right next to the car or in another parking space, not in the ingress, ingress of the hotel parking lot. Also keeping his, go ahead. You mentioned that as one of your points there, the fact that one of the men, I can't recall which, was a guest at the hotel. How does that weigh into him not feeling free to leave? To me, that seems like it would weigh the other way that he could simply leave and go back to his room. How do I see that as something that matters? Was that the question? I'm sorry, my screen froze. Yes, that's the question. I think it's important because as if you were staying overnight somewhere, I think you believe when you're in a parking spot of a place that you're spending the night, whether it be a hotel or your apartment or your home, I think you have a privacy interest there that's different than a public space. A lot of these cases talk about consensual encounters being in public spaces. This was not a public space. This was a private space. This is private property, a hotel. When you're spending the night at a hotel, I think you have a different privacy interest than you do on a public street. Counsel, I want to go back to the, you make sort of an insinuation about the manner in which he approached. Your brief talks about it being in haste. Again, I want to sort of try to distinguish and understand whether you're making a factual argument or not. There's nothing in the record that describes the manner in which he approached as being in haste or aggressive or any of the other adjectives that you used. Isn't that fair? I think it's the way you see his approach. His approach was in haste in the way that he immediately decided to drive, park in the ingress, egress of the hotel parking lot, parking his car catty-cornered instead of finding a regular spot to park in, as well as going directly to the driver's side door and in uniform with his service weapon, with his flashlight shining. He could have done, just so I understand, he could have done all those things at a snail's pace, right? So he could have gotten his walker out and he could have very slowly moved to his car and driven it very slowly. And at each step, that could have been done slowly. And the problem I've got is that, you know, based on our precedent, we have to take the facts the most favorable to the government here. And if you don't have evidence that he acted in haste, again, I don't think we get that factual finding reversed here. I don't think I need any to answer the first part of your question. Am I putting this as a factual argument for clear error? No. That's not the standard of review I'm hoping that you're using. I don't see the facts the same way as the government does or that the district court did, but I don't think the facts are important to make up whether there was a consensual encounter because the facts are how we get there. The facts, the way the facts came through is how we get to whether a reasonable person would feel free to leave. Okay. Ms. Gross, I think you have some time in rebuttal and your time is up. So I know you don't want to cut into Ms. Haney's time. Sure. Thank you. Thank you. Ms. Haney. Thank you. May it please the court, the Senate report, counsel, Ms. Leslie for the government. My name is Belinda Haney and I represent Oscar Watkins. First, I want to start by saying it's an extreme honor for me to appear before this court on this very important issue of constitutional magnitude. We certainly are here in uncertain times with the events that are occurring. And that's why it's so important to consider the protections reported by the Fourth Amendment of the United States Constitutions and the doctrines by Nardone and Wong-Sun regarding the fruits of the poisonous tree doctrine. As Ms. Gross has just argued, we believe that Officer Brakeiron illegally detained our clients without reasonable suspicion when he pulled his cruiser up behind the truck that belonged to Mr. Nicely and my client was a passenger. And I'm going to sort of divert my argument for a minute, and if I may, the court will allow, and talk a little bit about Judge Plea's findings with regards to that. He specifically found from the video that the officer had to take 14 to 15 steps to approach the Nicely truck. That's really not very far. That's only, in my estimation, probably like two or three feet. And so when you look at that, you consider, yes. Fourteen or fifteen steps is two or three feet? Is that what you said? Yeah, I think so. You know, if you walk out, oh, I'm sorry. I'm sorry. I know it's probably about, it's more than that, 15 feet. I'm sorry. Well, more like 14 or 15 yards, right? Not feet. Right, right. Yes. Yes. I mean, we always counted one step as about a foot, right? I don't know how tall this officer is, but that's a Tim Conway kind of step. In the questioning at the suppression hearing, I asked the officer some pretty direct questions about whether or not Mr. Nicely would have been able to back out and leave the area. And he said that he could have. But he clearly would have had to have maneuvered his vehicle around the officer's marked vehicle. And so I just wanted to point out, you know, in the Jones case, this court talked about McChesney v. State, which I think was a Wyoming case, where the court sided with that case. Ms. Haney, weren't the two other police officers that arrived in two other separate vehicles able to maneuver around and get into the parking lot? I believe that the first officer was a K-9 unit and he pulled up beside, sort of, I guess, Caddy Corner, the way I recall the video, Caddy Corner to Officer Brakeiron. And I honestly can't recall, I think the other vehicle might have been behind, but I can't specifically recall that. And I'm sort of digressing from my argument, but, you know, I just wanted to reiterate that the fact that they could have left is not what this court has looked at before. They've talked about the fact that maneuvering, being able to maneuver, still doesn't take away the reasonable person's feeling that they're not free to leave. And I think that when the cruiser pulled up with the lights on, at that point it's dark, their lights are on the back of the vehicle. I think any reasonable person would have felt that they were not allowed to, or they should not exit the vehicle and try to leave the area. So, based upon the interaction that the officer had with my client after searching him after the detention, he located some items which led him to believe that Mr. Watkins was a guest at the hotel. Based upon the search of the vehicle and the information that the officer obtained from my client, they obtained search warrants for the hotel and my client's and Mr. Trapp's cell phones. The search, as this court knows, was revealed in the hotel room, methamphetamines, other drugs, cash, and some firearms. District Judge Klee did not address the Leon Goodfaith exception in this case because obviously he found that there was no illegal detention. But if this court were to agree with us that our clients were legally detained... Do you agree, if you lose on the first issue, if we find that the officer break-irons activities with the vehicle were proper under the Fourth Amendment, do you agree that the warrant issue also fails? Yes, Your Honor, I do agree with that. I thought you did, I just wanted to make sure that you're not making an alternative argument. It's really dependent on this first issue. It is, it is. And that's why I wanted to go back and talk a little bit about the Jones case and the initial detention of the clients. But I would cite the case of U.S. v. Mullet where this Honorable Court addressed the issue as to whether or not the Leon Goodfaith exception applies in a case where the illegal or the entirety of the contents of the affidavit in support of the search warrant are comprised wholly of facts which were obtained in violation of Mr. Watkins' Fourth Amendment rights. I believe that he was detained as a passenger, so he clearly has standing to raise this issue and so that I think in putting together the Fruits of the Poisonous Tree doctrine and sort of juxtaposing that with the Leon Goodfaith exception, this Court should continue to hold what we believe to be sound law that the Goodfaith exception should not apply in this case. So this is precisely the situation that we have here, that the officer illegally detained our clients. Ms. Haney, your red light is on, so if you'd like to wrap up. Well, yes, Your Honor. We would just ask this Court find that our clients were legally detained, that the officer did not have sufficient reasonable suspicion, and that the Leon Goodfaith exception does not apply in this case if the Court finds that the detention was illegal. Thank you. Thank you. All right, Ms. Wesley. May it please the Court, my name is Zelda Wesley and I'm an attorney for the government. The circumstances as they unfolded made it clear that Officer Brakeiron, on a regular basis, patrolled the area behind the Euro Suites, particularly that parking lot. The record makes it abundantly clear that law enforcement was familiar with that location because of other activities that took place in that area. In prior wire interception investigations, officers watched numerous drug transactions take place in that area. But more specifically, the staff of Euro Suite communicated to the Morgantown Police Department and, in essence, several spoke with Officer Brakeiron about the activities that took place in that back parking lot. So, anybody in that back parking lot of a hotel with a number of rooms in it is subject to suspicion? Is that the government's argument? No, it is not, Your Honor. This was at 1.30 in the morning. Officer Brakeiron... Okay, so anybody in that hotel parking lot at 1.30 in the morning is subject to suspicion? No, Your Honor, but Officer Brakeiron, as he watched and saw someone exit the area of the hotel and he saw someone seated in a car and he saw the interior light go on a couple of times as someone entered the vehicle. What Officer Brakeiron knew was that... Doesn't the interior light always go on when somebody enters a vehicle? Yes, it does, but his testimony was that the light went on and off a couple of times after someone was seated in the vehicle, suggesting that they were doing something in the vehicle. And so, what Officer Brakeiron's concerns was what was going on, if they were guests of the hotel, were they not meeting in the hotel? Judge Richardson has a question. Counsel, again, I'm just trying to understand. Why do you begin your argument, and I'm just trying to understand, talking about the suspicion the officer had before he pulled up? I thought the district court below, none of that mattered, right? He pulled up and he made a consensual walk up to the vehicle, and it didn't matter if he had any suspicion at that juncture. And so, I'm just curious, why is it that you think... This is sort of the inverse of what I asked your colleague. She wanted to change the district court's facts to suggest a different set of scenarios. But you're also trying to a little bit turn it and talk about the suspicion prior to pulling up in the parking lot. And I thought the district court found that he needed no suspicion to pull into the parking lot and walk up to the vehicle and ask what was going on. No, and I agree with that. I was just setting the stage as to why he was there. I absolutely agree with that. I agree with the district court's determination. He approached these vehicles. I just wanted to make it clear as to why he was in the position to view the vehicles in the first place. So let me maybe reframe it. Does it matter why he was there at all? Let's imagine that he dropped a hat and he was looking for his hat. Does it make any difference for us why he was there? It does not, your honor. He approached the vehicle. I think it's important just to establish why he was there, because in his mind he's there just because it's a part of his routine duties. That's the only reason why I set the stage for that. Once he observed what he observed and he approached the vehicles in a consensual manner, he does not use his emergency lights. He does not pull his weapon. He parked his vehicle. I may have misheard, but I thought opposing counsel said his emergency lights were on. His emergency lights were not on. He approached the vehicle. He does not have a weapon drawn. There's nothing in his demeanor or the manner in which he parked his vehicle that would have suggested to a reasonable person that they were in any way detained or not free to leave. The moment he approached the vehicle and the window was down, he immediately smelled marijuana. Once he smelled the marijuana, he now has probable cause to search, and also there is reasonable suspicion. From that moment on, those men are not free to leave, and what Officer Brakehorn did at that point in time, after he questioned them and their stories didn't match, he contacted the Right. So we're familiar, I think, with the facts. My question is the reverse of what Judge Richardson asked opposing counsel. Do you concede that if the initial search was unlawful, then the follow-on search warrant of the hotel room was also unlawful? The search warrant was based on that initial search of the vehicle. It was, Your Honor, but in essence, there was a separate officer who conducted that end of the investigation, and the affidavit for that search warrant spelled out all of these details. So even if that were the case, I still think that the officers can rely upon Leon, because nothing was hidden in that affidavit. The affidavit spelled out the details of what transpired. Your opposing counsel described it as possible, but difficult to maneuver around the officer's vehicle. What was the District Court's finding about maneuverability? The District Court specifically found that there was ample room for that vehicle to pull out. That is basically established that when Officer Braegarn initially arrived on scene, he obviously had one vehicle. By the time it concluded, there were three vehicles parked side-by-side. So there was ample room for their vehicle to pull out, if it was so inclined to do so. In addition to that, one of the things that's important is that when he approached, to make it clear, yes, he had a firearm, but the firearm was not displayed. It was not pulled in any manner. There was ample room for the vehicle to pull out. He never used his emergency lights. There was no show of authority. It was an emergency vehicle. Under Stover, we ask two different questions. We ask, was there a show of authority and was there submission to that show of authority? The District Court below seemed to find both. There was no show of authority and there was no submission to authority by the There was no evidence in the record that they saw the vehicle approaching. By the time they saw the officer, the officer was there and so they didn't have time to passively submit to whatever authority was being shown. That's correct, Your Honor. There's no evidence that they observed the officer approach. There's no evidence that in any way they questioned what he was doing. The record is completely devoid of anything from the defendants suggesting that honestly that they felt that they had to submit to his show of authority. By contrast, the evidence that we do have was that he approached, he questioned him about what was going on. He immediately smelled marijuana upon approaching the vehicle, which is corroborated by every other officer who arrived on scene. Officer Helms and Officer... Your colleague suggested that as soon as he drives into the parking lot, there was a seizure. Your position is that the seizure effectively occurred when he began questioning them because at that point he had smelled marijuana and he had the ability to do that. And that's where he testified, once I smelled the marijuana, in effect, they couldn't leave at that point because I was doing a drug investigation. That's correct, Your Honor. The second he smelled marijuana, he understood that there was going to be some follow up. His testimony was that he called Officer Helms, who was a canine officer. So after he smelled the marijuana, they were not going to be free to leave. There's no evidence, though, that they wanted to leave or that they thought to leave. We know his intentions based upon his testimony, which was the second he smelled marijuana, he was not going to let them leave that scene. But there's no evidence to the contrary. One, that they felt like they needed to leave or that they wanted to leave. So the testimony is, after he approached the vehicle, he smelled the marijuana. And from then on, they were, in essence, detained. In essence, Your Honor, after Officer Brakehorn left his vehicle and approached Watkins and Nicely in that vehicle, he had probable cause to search. He had probable cause to search and he also had reasonable suspicions. Simultaneously, based upon the smell of marijuana, which was not legal, nor is it legal in West Virginia at this point in time, it has been approved for medicinal purposes, which didn't take effect until 2019. So at that point in time, even if there was a suggestion that they had the marijuana for some sort of legitimate medical purpose, which there's no evidence that it does, at that point in time, it would not have been legal in West Virginia. In addition to that, there certainly is no suggestion that either Mr. Nicely or Mr. Watkins even knew that the defendant, I'm sorry, that the officer was present. It's interesting, in the manner that he approached, and there's a good exhibit, which is exhibit 406 in the joint appendix, which shows the vehicle. So counsel, I'm questioning about that because I thought when Officer Braeckarn testified, he testified that as he approached, he overheard the occupants of the vehicle say, I can't believe this cop is coming to talk to us. Isn't that evidence that they had seen that he was a cop before he got to the window? Or should I read that testimony of the officer differently? I believe that that testimony was elicited in response to him approaching them. Once he approached them, I got the impression from his testimony that they found that there was humor in the fact that he was approaching them, and that was the essence of that conversation. So based, and I don't have it in front of me, but your recollection, at least, is that that testimony is after they're talking or is it before they are talking? You see what I'm saying? I get that. Is it before or after he smells the marijuana is the core question? My recollection of it was that it was while he was at the window, and that may not be accurate, but that was my recollection, was that they seemed to have been amused that the officer approached them in the midst of what was going on. In any event, none of that is decisive on this point. Once he approaches the vehicle, the windows down, and he smells marijuana, in essence, he has probable cause. And that's the summation of this case. I recognize that I have quite a bit of time left. If there's any questions from the court, I'm certainly happy to answer them. I don't think we have any further questions, Ms. Wesley. Thank you for your argument, and we'll hear again from Ms. Gross. Thank you. I want to quickly go over some of those facts that I find extremely important that we just discussed. These facts leading up to, I think, Judge, you were right. There are facts in the record that say, and I read it, obviously I read it the way that I think my client intended it, the officer heard them talking as he approached the vehicle. Also, in the joint appendix, it says in many places that Officer Brakeiron had intended a drug investigation far before he smelled marijuana. Far before. If you look at the joint appendix on page 157, 125, 124, he says he's investigating what he believes to be a drug deal way before he pulled up and smelled marijuana. Let's get this straight. He was thinking right away it was a drug investigation, and when asked if they could leave, he said that they could have left, but he wasn't going to leave because I was there, and I was going to talk to them. So the intent matters because it shows what his actions were. His actions are affected by his intent. Just because what he thinks in his head isn't something we consider, it does affect his actions. I think those things are important. I think our clients did know police were around. The record shows that they couldn't have seen them. Well, there was a guy leaving a hotel and walked across the We're talking about a reasonable person standard. I want to quickly talk about the factors. Nobody's discussed the factors. I wasn't able to do so at the beginning. The United States v. Black factors, whether a reasonable person would feel free to leave. There's seven factors this court set out. We went over a lot of them because this is very fact-based, but I think it's important that a show of doesn't mean there wasn't a show of authority. Judge Thacker mentioned I said his lights were on. Yes, his headlights were blazing onto the back of my client's truck. They never were turned off. That's pretty aggressive. Imagine at 1.30 in the morning, blazing headlights shining on your truck and an officer comes to your truck window with a flashlight shining in your eyes, accusing you of doing something This is very similar to the Jones case. I know Ms. Haney brought it up. I want to make it clear that I think that it's strikingly similar to the case in Jones. The totality of the facts are what we need to look at here, just like this court did in Jones. We need to look at all of the facts, all of the context around it to get to whether a reasonable person would have felt free to leave. What is the evidence with respect to what your clients knew of the positioning of the officer's vehicle and whether they would be able to, as you say, maneuver around it to leave? My clients did not testify to any of this, so their thoughts, personal, are not in evidence, Judge. However, what is the evidence of them not feeling free to leave? I just think it's the reasonable person standard we have to look at. We look at the facts. That's what I'm getting at. If they had to, for your argument, they had to feel reasonably that they could not leave, I'm looking for the evidence that would have led a reasonable person to believe they could not leave. It's these facts I'm talking about leading up to the police officer smelling marijuana. This police cruiser drives in, parks patty-cornered in the egress ingress of the hotel. That's an important fact, I believe. Even if you look at the facts in the light most favorable to the government, the way he pulled up, what he was wearing, how he had his lights on, shining both the flashlight and his car lights, shining on the defendants, as well as asking pointed questions. It wasn't, hey, how you doing? It was, what are you doing here? Did you do anything illegal? And I just want to tell this court, I think this case fits in between this court's findings in its past cases. The sites that the government had, they're very different than our case sites. It's because the vehicle specifically in United States v. Lewis, it was a different set of facts. That police vehicle was parked on the opposite side of the road. That's nowhere close to the way this police vehicle was parked. And they saw something in the vehicle before even approaching, something that could have been illegal. It's just a totally different set of facts. That case is not an analogous to our case. I think that Jones is the quickest case to be on point. Ms. Gross, I appreciate your enthusiasm on behalf of your client, but you're over time. No, I appreciate your enthusiasm, your zealous representation of your client. But unless any of the other judges have questions, we'll take the case under advisement now. Would you like to wrap up a couple sentences, Ms. Gross? Just very quickly, I would like this court to find that the gentlemen were seized upon this police encounter inception and that the district court erred in denying the motion to suppress. I'd like for you to reverse. All right. Thank you. Well, as you all know, if we were in person in Richmond, we would now be coming down from the bench to greet you. Even though we can't do that in person, please know that the three of us appreciate your arguments and greet you from afar. And Ms. Haney, I understand that you are court appointed and the court likewise very much appreciates your work. We wouldn't be able to do this without the good work of attorneys like you and Ms. Gross and Ms. Wesley. And we appreciate it. Thank you so much. It's an honor to be here.
judges: Stephanie D. Thacker, Julius N. Richardson, Kenneth D. Bell